**EASTERN GAS AND FUEL ASSOCI- ATES, a Voluntary Trust Asso- ciation, Plaintiff,**

v.

**MIDWEST–RALEIGH, INC., a corpora- tion, the Travelers Insurance Company, a corporation, Interstate Engineers & Constructors, Inc., a corporation, the Fi- delity and Casualty Company of New York, a corporation, Alma Jean Jones, Administratrix of the Estate of Robert L. Jones, deceased, Evelyn Elizabeth Ice, Administratrix of the Estate of Gay W. Ice, deceased, Arlie Spry, William J. Ice, and William E. Zirkle, Defendants.**

**Civ. A. No. 750–F.**

United States District Court
N. D. West Virginia,
Fairmont Division.

April 11, 1966.
Supplemental Opinion May 21, 1966.

Russell L. Furbee, Furbee & Hardesty, Fairmont, W. Va., and William C. Walker, Dickie, McCamey & Chilote, Pittsburgh, Pa., for plaintiff.

Willis O. Shay, Steptoe & Johnson, Clarksburg, W. Va., for defendants Midwest-Raleigh, Inc., The Travelers Ins., Co., Interstate Engineers & Constructors, Inc., and The Fidelity & Cas. Co. of New York.

CHRISTIE, District Judge:

This is an action for declaratory judgment under 28 U.S.C.A. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Federal jurisdiction by reason of diversity and requisite amount is found to exist under 28 U.S.C.A. § 1332.

For brevity, the plaintiff, Eastern Gas and Fuel Associates, will be referred to as "Eastern," and the defendants here

immediately concerned, Midwest-Raleigh, Inc. and Interstate Engineers & Constructors, Inc., as "Midwest" and "Interstate," respectively.

## I—Historical Background

The incident giving rise to the underlying controversy was an explosion at the coal mine of Eastern at Grant Town, in Marion County, West Virginia, on July 16, 1962, in which certain of Interstate's employees were either killed or injured, and in which Interstate's machinery and equipment were damaged. Suits for damages were thereafter brought against Eastern by all aggrieved parties.

Thereupon Eastern filed a third-party complaint against Midwest and Interstate on the premise that the explosion was caused by their negligence, either jointly or severally, and further, that they had, prior to the explosion, contractually agreed to indemnify it against loss by reason of claims such as those asserted. Initially, Eastern contracted the sale and dismantling of an abandoned coal tipple and cleaning plant to Midwest on April 30, 1962, inserting therein the following provision for its protection:

"Purchaser (Midwest) will protect and indemnify Eastern against loss or damage to property and injury and death to persons resulting from, arising out of or, incident to the performance of this contract."

Then on May 15, 1962, Midwest, with Eastern's consent, subcontracted the job to Interstate; Interstate agreeing to,

" * * * assume and perform all of the conditions, provisions and terms covenanted to be performed on the part of Midwest * * *,"

under its contract with Eastern. In short, Interstate simply stepped into the shoes of Midwest with Eastern's consent and approval. Midwest and Interstate were both required to carry liability insurance and to subscribe to Workmen's Compensation for Eastern's protection.

After the institution of the damage actions, but before their trial and adjudication, Eastern filed this declaratory judgment action against Midwest and its insurance carrier, Interstate and its insurance carrier, and all the plaintiffs in the damage actions, seeking, among other things, a declaration of rights, duties, responsibilities and legal relationships of the parties, and particularly for a declaration as to Eastern's rights and liabilities in relation to Midwest and its insurance carrier and Interstate and its insurance carrier under the aforesaid indemnity provision.

Counsel for Eastern and counsel for Midwest and Interstate, with the concurrence of the Court, agreed that a resolution of the issues raised by the pleadings in the declaratory judgment action should best await the fixing of fault for the explosion in one of the damage actions. Accordingly, trial of the wrongful death claim of the estate of Gay W. Ice against Eastern was commenced on May 10, 1965, resulting in a verdict and judgment adverse to Eastern. In the trial of that action, to simplify the case for the jury, it was agreed by all counsel that the issue of contractual indemnity between Eastern and Midwest and/or Interstate, raised by the third-party complaint, would not be submitted to the jury, and if a verdict adverse to Eastern were returned, that issue would then be submitted to the Court, without a jury, upon the pleadings in the declaratory judgment action and the record as made in the tort action of Ice v. Eastern. Eastern has since paid the Ice verdict and judgment and is now seeking indemnification and/or contribution from Interstate and/or Midwest. Thus in this declaratory judgment action, the rights of Eastern, on the one hand, and the rights of Midwest and/or Interstate, on the other hand, as to the Ice verdict and judgment, must be considered and determined in the context of the record as made in the Ice case, whereas such record is not proper for consideration with respect of the other tort cases yet to be tried.

Two questions are thus presented:

*First:* Does the language of the indemnity provision admit of an interpretation that Eastern may have indemnity

even for a loss occasioned by its own negligence?

*Second:* Is the finding by the jury of proximate negligence against Eastern in the Ice case conclusive on Eastern as to that issue in this declaratory judgment action between Eastern, on the one hand, and Midwest and/or Interstate, on the other?

These questions will be taken up in seriatim.

## II—Interpretation of Indemnity Provision

The agreement containing the indemnity provision involved here was drawn by Eastern and if it be found vague in its terms and meaning, the doubt must be resolved against Eastern. Southern Ry. Co. v. Coca-Cola Bottling Co., 145 F.2d 304 at 307 (4th Cir. 1944). Moreover, Judge Parker has aptly said that a contract of indemnity will not be construed to indemnify the indemnitee against a loss resulting to it through its own negligent acts, where such intention is not expressed in unequivocal terms. Cacey v. Virginia Ry. Co., 85 F.2d 976 (4th Cir. 1936) at 980. This is in accord with the majority rule for construing an indemnity provision, such as is involved here, as will be seen from an examination of 175 A.L.R. 30 (1952),

> "In the overwhelming majority of the cases the result reached by their interpretational efforts can be condensed into the simple rule that where the parties fail to refer expressly to negligence in their contract such failure evidences the parties' intention not to provide for indemnity for the indemnitee's negligent acts. While this rule of construction is expressed by the courts in various forms, all of them in effect say: 'A contract of indemnity will not be construed to indemnify a person against his own negligence where such intention is not expressed in clear and unequivocal terms.' "

While Eastern in its brief refers to 97 A.L.R.2d 616 as the most recent annotation relating to the duty of construction contractors to indemnify contractees held liable for injury to third persons, we do not read the annotation as changing or modifying the majority rule above referred to. For example, Section 3 of the later annotation (97 A.L.R.2d 620) gives the general rule in relation to construction contracts thusly:

> "It may be stated as a general rule, subject to conditions and qualifications hereinafter noted, that where the contractee is cast in liability for an injury to a third person solely by reason of some wrongful act or omission of the contractor in the performance of the contract, he is entitled to be indemnified by the latter (citation of authorities omitted).

> "In order, however, to impose such duty of indemnification upon the contractor *in the absence of an express contract therefor,* it is essential that he be chargeable with some fault or negligence causing or contributing to the injury." (Emphasis supplied).

So it is seen that this later annotation recognizes the majority rule given in the earlier annotation to the effect that, to have indemnity, the contractee (Eastern here) must show a contract provision expressly providing for it, or that the injury was caused by the negligence of the contractor (Midwest and/or Interstate here).

The West Virginia Supreme Court of Appeals adhered to the majority rule in Bowlby-Harman Lumber Co. v. Commodore Service, Inc., 144 W.Va. 239, 107 S.E.2d 602 (1959), when it said:

> "Moreover, to relieve a party from liability for his own negligence by contract, language to that effect must be clear and definite."

In Washington & Berkeley B. Co. v. Pennsylvania S. Co., 215 F. 32 (4th Cir. 1914), the indemnity provision provided,

> " * * * against all liability of damage on account of accidents, whether occasioned by the omission or negligence of itself, its agents, or its workmen or otherwise."

The Court there held that the provision could not be construed to cover accidents

caused by the negligence of the indemnitee. In Standard Oil Company of Texas v. Wampler, 218 F.2d 768 (5th Cir. 1955), a similar indemnity provision reads as follows:

"Contractor shall indemnify Standard against damages or claims for injury to persons, impairment of health of persons, and death of persons, and damages to property or loss of property, that may arise from Contractor's operations hereunder, * * * ."

There, again, the Court held that nothing in the contract indicated an intent that contractors were required to indemnify the oil company against oil company's own negligence. The language used in George Sollitt Const. Co. v. Gateway Erectors, Inc., 260 F.2d 165 (7th Cir. 1958), probably comes closest to the indemnity agreements herein. It provided,

"The Contractor assumes entire responsibility and liability for losses, expenses, damages, demands, and claims in connection with or arising out of any injury or alleged injury (including death), or damage or alleged damage to property, sustained or alleged to have been sustained in connection with or to have arisen out of the performance of the work by the Contractor * * * ."

The Court held the language used could not be construed to indemnify against the negligence of the indemnitee as such intention was not expressed in unequivocal terms.

Finally, in seeking to understand the intention of the parties, and thus properly interpret the contracts they entered into, we think the statement in Perry v. Payne, 217 Pa. 252, 66 A. 553, 11 L.R.A., N.S., 1173, is quite apropos here,

"It is contrary to experience and against reason that the contractors should agree to indemnify Perry against the negligence of himself or his employees. It would make them insurers, and impose a liability upon the contractors, the extent of which would be uncertain and indefinite, and entirely in the hands of Perry. The results of such a liability might become most disastrous. * * * A single act of negligence on the part of the owner or his employees, over whom the contractor would have no restraint or control whatsoever, might create a liability which a lifetime of successful business could not repay. An interpretation of the bond which might give rise to such results could hardly be regarded as reasonable or as giving effect to the intention of the parties."

■ We must, therefore, conclude that the language of the indemnity provision under consideration cannot fairly be construed as expressly safeguarding Eastern from the effects of its own negligence.

III—Effect of Jury Verdict Against Eastern in Ice Case in Relation to Rights of Parties in Declaratory Judgment Action

■ Eastern further contends that the judgment rendered against it in the Ice tort action has no binding effect on it in its contractual dispute with Midwest and/or Interstate, since they were not parties to the prior action. In our view, it is not entirely accurate to say Midwest and Interstate were not parties to the Ice action. While it is true Ice did not sue Midwest and Interstate, but, as already shown, Eastern did later bring them in as third-party defendants, alleging in its third-party complaint that the explosion was proximately caused by their negligence, either jointly or severally, and was not due to any negligence on its part. Thus, Midwest and Interstate were in fact made parties defendant to the action and their negligence was in fact raised as an issue therein. Only the question of Eastern's right to indemnify under the contract was, by agreement of counsel, removed from the Ice trial. The decision of Midwest's and Interstate's counsel not to actively participate in the Ice trial, as the Court then understood it, was a trial tactic that met with and had the approval of Eastern's counsel, and Eastern will not now be heard to complain that Midwest and Interstate were too inactive in the Ice trial or were not parties litigant to it.

The general rule in this regard is stated in 24 A.L.R.2d 330 (1952) as follows:

"*Irrespective of whether a judgment obtained by an injured person against an indemnitee (Eastern) is conclusive upon the indemnitor (Midwest and Interstate) under the general rules governing the conclusiveness of judgments*, the authorities which have considered the subject of this annotation as a distinct question hold *unanimously that an indemnitee, in his action to recover from the indemnitor the amounts paid in satisfaction of a judgment obtained against him by an injured person, is bound by all findings, without which the judgment could not have been rendered, and that, if the judgment rendered in the earlier action rested on a fact fatal to recovery in the action over against the indemnitor, the latter action cannot be successfully maintained.*" (Emphasis supplied).

See also 30A Am.Jur., Judgments, Section 424 (1958); Shell Oil Co. v. Foster-Wheeler Corp., 209 F.Supp. 931 (E.D.Ill. 1962); B. Roth Tool Co. v. New Amsterdam Casualty Co., 161 F. 709 (8th Cir. 1908); Aluminum Co. of America v. Hully, 200 F.2d 257 (8th Cir. 1952); and 24 A.L.R.2d 333 (1952).

Furthermore, the rule admits of no distinction whether the judgment in the first action was based upon tort or contract. Cf. 30A Am.Jur., Section 424 (1958); 24 A.L.R.2d 331–335 (1952). However, the rule, of course, does not apply to issues not submitted in the prior action. Shell Oil Co. v. Foster-Wheeler Corp., supra. Thus, in the light of this rule, of particular importance here is whether the jury's verdict forecloses any possibility of Eastern now asserting that it was not negligent in the prior action and claiming instead that Midwest or Interstate was the negligent party, or that they were jointly or severally negligent with it, entitling it to contribution under the rule that joint tortfeasors are mutually responsible to each other and must share the burden of their joint wrong. W.Va. Code 55–7–13; 4 M.J., Contribu-

tion and Exoneration, Sec. 22, p. 528. In this regard, after charging the jury on the issue of Eastern's primary negligence, the Court then charged on the issue of Ice's and the other Interstate employees' contributory negligence, in these words:

"\* \* \* unless, however, you shall also believe from a preponderance of the evidence that Ice and the other employees of Interstate on the job were at the time not exercising due care for their own safety, in that the conditions causing the accident were obvious to them and they failed to take due notice thereof, or would have been obvious to an ordinary prudent person exercising due care for his own safety under the circumstances shown by the evidence in this case, or that they failed to take and use reasonable and proper safety measures and equipment for their own safety, in which event, if you shall so find, then Ice was guilty of contributory negligence, barring any recovery to his estate herein."

Thus, Ice, being Interstate's general superintendent and concededly acting at the time within the scope of his employment, the Court is of the opinion that the issue of Interstate's negligence was sufficiently submitted to the jury by this portion of the charge so that the verdict in favor of Ice's widow against Eastern necessarily excluded a finding of any negligence against Interstate. For it was the specific purpose of this portion of the charge to tell the jury they could not return a verdict against Eastern if they found contributory negligence by Ice. Obviously, the relationship of master and servant, admittedly existing at the time of the explosion between Interstate and Ice and Interstate's other employees on the job, made Interstate, under the doctrine of *respondent superior*, responsible for their acts and conduct, and, in law, their negligence or contributory negligence is tantamount to Interstate's. Jenkins v. Montgomery, 69 W.Va. 795, 72 S.E. 1087; Vance v. Frantz, 83 W.Va. 671, 99 S.E. 12; Eggleston v. Tanner, 86 W.Va. 385, 103 S.E. 113. True it is that the question of Midwest's negligence was not submit-

ted to the jury, but this was not required since there was no evidence whatever before the jury tending to point to any fault by Midwest or any of its servants and employees. In fact, the evidence plainly showed that Midwest had nothing to do with the actual dismantling work after it subcontracted the job to Interstate with Eastern's consent some two months prior to the explosion. There thus being no evidence concerning any negligence on Midwest's part, no issue of fact was raised between Ice and Midwest, or between Eastern and Midwest, or between Interstate and Midwest, for the jury to resolve.

■ Believing, therefore, that the jury's verdict presupposed a finding that Eastern's negligence was the sole proximate cause of the explosion and Ice's resulting death, such finding is conclusive on Eastern on that issue as to the Ice case in this declaratory judgment action and it will not be permitted to assert otherwise. See Lewis v. United Air Lines Transport Corporation, 34 F.Supp. 124 (D.Conn. 1939); Washington & Berkeley B. Co. v. Pennsylvania S. Co. 215 F. 32 (4th Cir. 1914).

### IV—Conclusion

From what has been said, it is the conclusion of this Court:

(A) That since Eastern's negligence in the Ice case has already been conclusively established as the sole proximate cause of the explosion, and since it has also been determined that the indemnity provision does not expressly and unequivocally indemnify Eastern against the consequences of its own negligence, Eastern is, therefore, precluded in law from having indemnity or contribution from Midwest and/or Interstate, or from their respective insurance carriers, for the amount of the verdict and judgment it has paid in the Ice case.

(B) That likewise Eastern will be precluded in law from having indemnity or contribution from Midwest and/or Interstate, or their respective insurance carriers, for any loss it may ultimately suffer in the other personal injury or wrongful death actions pending against it, unless at the trial thereof it is found that negligence of Midwest and/or Interstate concurred jointly with negligence of Eastern to proximately produce the loss.

(C) That likewise Eastern will be precluded in law from having indemnity from Interstate, or its insurance carrier, in the latter's action against Eastern for damage to its machinery and equipment if it be found in the trial of that action that such damage was proximately caused by Eastern's negligence.

(D) That if any legal liability for indemnity should ultimately fall upon Midwest and/or Interstate as a result of the trial of the other pending actions for damages against Eastern, such liability, under the terms of the assignment agreement between Midwest and Interstate, would in law primarily be upon Interstate to discharge, absent a finding that the same was proximately caused by Midwest's negligence.

An order will be entered in consonance with the views herein expressed.

### SUPPLEMENTAL OPINION

■ Eastern contests the result reached by the Court in its original Opinion issued April 11, 1966, on the premise that the indemnity contract imposed upon Interstate the duty to exercise "extreme care", a standard higher than ordinary care, the standard applied in the tort action of Ice v. Eastern, and that, therefore, the jury verdict against Eastern in the Ice case is not dispositive of the issue raised by the contract between Eastern and Interstate. The pertinent language of the contract upon which Eastern relies reads:

"Purchaser (Interstate) will prior to removal of equipment, etc. and prior to use of cutting torches, saws or other tools and/or equipment will remove all coal and/or coal dust from said equipment, building, etc., by hosing down all structures inside and out and will otherwise perform this work with all safety precautions including stand-by first aid fire fighting facilities and *will exercise extreme care in the per-*

*formance of this work to prevent fire and/or other damage or accident to property and persons of the Seller (Eastern) or others."* (Emphasis added)

The issue thus raised necessarily calls for an interpretation of the meaning of the term "extreme care," viewed in the context of the contract as a whole, its subject-matter and the intention of the parties, in order to determine if there was a breach of any contractual duty on the part of Interstate in the performance of the work contemplated by the contract. The contract called for the dismantling of a large coal tipple and cleaning plant of metal construction requiring the use of acetylene torches, cranes, jackhammers and other types of light and heavy equipment. That Eastern recognized the performance of the contract was a hazardous undertaking is evident from the contract requirement that Interstate subscribe to Workmen's Compensation and carry $500,000 liability insurance for bodily injury and a like amount for property damage as protection to Eastern. Under such circumstances, the contract provision for the exercise of "extreme care" is interpreted to mean such care as an ordinary prudent person engaged in a like undertaking would have exercised under the same or similar circumstances. Thus the test is not whether in degree Interstate exercised slight, ordinary, or extreme care, but whether it, under the circumstances, exercised care commensurate with the potential hazards that were inherent in the very nature of the work it was required to do in fulfillment of its contractual obligation.

Viewing the evidence of record in this light, we start with the basic finding that Ice and the other employees of Interstate under him exercised due care in the dismantling process. This conclusion necessarily follows from the jury verdict and, as previously mentioned, Eastern is bound by this finding of the jury.

We turn now to the evidence and review it in light of the contractual provision relating to the use of "extreme care" and the nature of the work required to be performed and the potential hazards inherent therein. Of primary importance in this regard is the ascertainment of whether or not Interstate knew if the mine shaft under the preparation plant, which was to be demolished, was open or still in use and whether proper safety measures were used by Interstate in dismantling the plant. Harold Sargeant, president of Interstate Engineers and Constructors, Inc., testified that when he and Ice first went out to the plant, they discussed with Laird, general superintendent of the mine, the condition of the shaft. He stated that Laird told him, "Don't worry about the shaft—the shaft is filled and sealed." Sargeant further stated that he did not see any vents or a trap door on the slab covering the shaft and "I didn't look for them, because I assumed the shaft was filled," and "because there was so much debris on top of there it would not have been possible to see it." During the course of the work, Sargeant testified that he did not receive any complaints from Eastern about the way the work was progressing or the manner in which it was being done except for an occasional telephone call from Laird asking them to speed up the job a little bit, as they were anxious to lay the new tracks. Concerning the safety precautions used, the testimony of Sargeant, on questioning by plaintiff's attorney, revealed the following:

"Q. * * * did your employees use these fire hoses or use the water equipment that was provided?

"A. Yes.

"Q. What did they do?

"A. They washed down—washed the coal dust off of the machinery and steel and then they would thoroughly soak the ground around where we were working, and there was no set rule as to when we would do it. It was done every day and on days when the sun was bright, and since this was July, why sometimes we would do it twice a day, just depending on if the ground—if any of that material got the least bit

dry, or we thought the moisture content was such that it would not support combustion, then we would use the hoses. That was the instructions they had from me and from the coal company."

"Q. Did at any time during the progress of this work, did Mr. Laird or any other official of Eastern, complain to you about your failure to use the hoses?

"A. Not that I know of, he never complained to me or the management that I know of.

\* \* \* \* \* \*

"Q. After the second shift, the evening shift would go off, would you leave anyone there during the remainder of the night, or was the job completely unattended?

"A. We would leave a man there until we were positive that there was no danger of any surface fire. The man might have stayed there for an hour or maybe longer. We have records of that."

■ This testimony, however, is in direct conflict with that of Laird. He testified that he told Sargeant the shaft was not filled with any non-combustible material. Concerning the vents and trap door, Laird further stated they were not hidden by debris, but were open for anyone to see. Pertaining to the methods used by Interstate in dismantling the plant, Laird testified he made the following complaints to Interstate:

1. To stop cutting steel with torches on and around the slab;

2. To stop using the crane up against the slab;

3. To stop blasting procedures that were being used in the area;

4. To keep all material off the slab; and

5. To stop smoking in the area.

On cross-examination, however, the discovery deposition of Laird, taken in Fairmont in 1963, was introduced and it revealed the following:

"Question: Did you discuss with Mr. Sargeant, after he commenced the work, anything in regard to the slab?

"Answer: No.

"Question: Did you complain to him or first did you notice any violation of your wishes or instructions after the work commenced?

"Answer: I didn't."

Thus, the Court as the trier of fact and judge of credibility of witnesses, finds that, based on the foregoing evidence, little weight can be attached to the testimony of Laird. The evidence and testimony of Sargeant is unimpeached in this sense and, consequently, must be accorded substantial weight. Believing, therefore, that Interstate and its employees were working on the assumption that the shaft was filled with non-combustible material, it cannot be said, in view of the nature of the work, that their use of cutting torches or working on and around the slab showed lack of extreme care on their part. This is further evidenced by the fact that in the contract to dismantle the plant, the parties contemplated the use of cutting torches for it specifically provided for them, and it is well known that when such torches cut through steel they throw out spanglers (molten particles of metal) as far as ten feet. Due to the fact that the preparation plant was located directly over the slab, it is hard to conceive that Eastern did not expect the cutting torches to be used in that area.

Finally, it is apparent from a reading of the contractual provisions in question that they were intended to cover surface prevention of fire, accident, etc. This is clearly evidenced by the specific reference in the contract to " \* \* \* hosing down all structures inside and out \* \* \* ." The contract between the parties made no mention of gas and it was never intended to burden Interstate with using extreme care to prevent a gas explosion below the slab. Especially is this true since the custody and control of the shaft was in the hands of Eastern.

Consistent with this interpretation, Eastern, throughout the trial proceeded on the theory that the injuries sustained were as a result of an above-ground explosion. It is clear, however, from the Bureau of Mines Report, the expert testimony, the position of the forty-six ton slab after the explosion and the other evidence of record, that the explosion was caused from an accumulation of methane gas under the slab and as far as this case is concerned, the Court so finds as a fact and it apparently is the theory accepted by the jury.

Even if this Court were to find from the evidence of record that Interstate was negligent in some degree in dismantling the plant, this would not necessarily render Interstate as the Indemnitor liable to Eastern as the Indemnitee under the indemnity provision of the contract involved, because, first, the comparative negligence rule is not in effect in West Virginia; and, second, the general rule is to the effect that where indemnity contracts are phrased in general terms, they are held not to indemnify in instances where negligence of the indemnitee is the primary or proximate cause of the loss or damage, particularly where the physical conditions are not under the exclusive control of the indemnitor. 175 A.L.R. 34 (1948); Missouri Dist. Teleg. Co. v. Southwestern Bell Teleph., 338 Mo. 692, 93 S.W.2d 19 (1936); Cf. Barber-Greene Co. v. Bruning Co., 357 F.2d 31 (8th Cir. 1966); Builders Supply Co. v. McCabe, 366 Pa. 322, 77 A.2d 368, 24 A.L.R.2d 319. It being established here by the jury verdict in the Ice case that Eastern's negligence was the proximate cause of the explosion, this factor is no longer open to attack and cannot be used in support of a claim by Eastern against Interstate for indemnification or contribution. Baltimore & O. R. Co. v. Saunders, 159 F.2d 481 (4th Cir. 1947); Builders Supply Co. v. McCabe, supra.

Believing, therefore, that the evidence in the Ice case justifies a finding of proximate negligence against Eastern for the explosion that caused Ice's death, Eastern is thus excluded from coverage under the indemnity provision.